UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
UNITED STATES OF AMERICA )
                                                    )
                    v.                          )               CRIMINAL NO. 08-10345-DPW
                                                    )
CHARLES TURNER                      )
 Defendant                                   )
_____ )

## DEFENDANT'S SENTENCING MEMORANDUM

Now comes the Defendant, Charles Turner, in the above-referenced matter, and hereby submits the following memorandum to assist the Court in structuring an appropriate sentence. Mr. Turner and his counsel suggest that a term of probation, supervised release, is the reasonable disposition and offers the following in support of his position:

### PROCEDURAL HISTORY

On November 21, 2008, Mr. Turner was arrested on charges of attempted extortion in violation of 18 U.S.C. § 1951, conspiracy to extort, and knowingly making a false statement to federal officials in violation of 18 U.S.C. § 1001.  On October 13, 2010, the Government dismissed the conspiracy count and the trial began on the remaining counts.  On October 29, 2010, a jury returned a verdict of guilty on all remaining counts.  The Defendant was released on the same pretrial conditions that were set at the arraignment, and sentencing was continued to January 25, 2011.

### DEFENDANT'S BACKGROUND

Chuck Turner has been a community organizer and civil rights activist in Boston, Massachusetts since 1966. Referred to as one of the best-known agitators in the city, he was elected to the Boston City Council in 1999, at the age of fifty nine (59). Turner was born in

1

Cincinnati, Ohio in 1941. He was raised by an aunt, Mamie K. Faulkner, and a grandmother, Laura Troy Knight. His grandfather, Doctor Charles Henry Turner, was a pioneering animal behavior biologist, while his father, Darwin Turner, was a pharmacist.

Turner graduated from Harvard University in 1963 with his B.A. degree in government. He then spent a year in Washington, DC, reporting for *The Afro-American Newspaper*. He then moved north, first to New York, then to Hartford, where he joined the influential civil rights group, the Northern Student Movement.

In 1966, he returned to the Boston area, joining the South End Neighborhood Action Program (SNAP) where he worked with families who were losing their homes to gentrification. Turner formed a community action group which pressured local government to provide trash clean-up in black neighborhoods and he led demonstrations which highlighted how inadequately city inspectors enforced building codes in public housing for the poor.

A former leader of the United Community Construction Workers and one-time chair of the Boston Jobs Coalition, Turner spent several years crusading against job discrimination in the city. He campaigned for increased hiring of blacks on city construction jobs. In 1991, unsatisfied with the mayor's enforcement of fair employment practices, Turner led a four-hour sit-in at the mayor's office which resulted in a number of key concessions being made.

Mr. Turner has also used his activism strategies and leadership skills to organize other community efforts. He played a leading role in a successful campaign to prevent the city from building a highway through predominantly black neighborhoods. Turner has also chaired the Southwest Corridor Land Development Corporation.

Mr. Turner did not run for office until 1999, approximately 33 years after beginning his activism in Boston. When he ran for office at age 59, he had no intention of beginning a long political career. His decision to run in 1999 was driven by his desire to energize organizing in Boston's communities of color, to test an organizing model of representation, and to demonstrate the ability of an elected official to be accountable and transparent.

As a Boston city council member, Turner continued his defense of civil and human rights. He authored an ordinance protecting transgendered people from discrimination. He successfully led an effort to protect the affirmative action guidelines of Massachusetts when Governor Mitt Romney sought to change them. And, as chairman of the Education Committee, he has rallied against educational inequality in the Boston public schools.

## STATEMENT OF THE CASE[1]

The Government alleges that, on or about August 3, 2007, in an attempt to obtain a liquor license for a nightclub known as Dejavu, a confidential witness (CW) paid Mr. Turner $1,000 as a bribe for his support and assistance. It was established at trial that Mr. Turner called for a hearing in the city council to determine where a number of liquor licenses had gone that were suppose to go to minority neighborhoods.  It was also established that Mr. Turner had called for a hearing prior to the time he allegedly received one thousand ($1,000) dollars from the CW. Also, it was established that it was not Mr. Turner who ultimately got the CW a liquor license.

---

[1] As the Court was present during the trial, and was able to evaluate the evidence, the Defendant does not provide an expansive recitation of the facts.  However it should be noted that the Government's statement of facts as provided to the Probation Department was not supported by the record in significant areas.

This CW was also involved in several undercover operations involving, Dianne Wilkerson, and also testified to making cash payments to Boston Police Officers.[2]

Ms. Wilkerson was arrested on October 28, 2008.  After her arrest, Turner agreed to meet with Federal Bureau of Intelligence ("FBI") agents and answered questions regarding his relationship and interaction with Ronald Wilburn in July/August, 2007. When a photo was shown to Turner, he told agents that he did not remember who the person was although he looked familiar, and denied receiving money or an offer from Wilburn to hold a fundraiser. The Government alleges that Mr. Turner provided the agents three (3) false statements.  According to the Government, Mr. Turner lied when he told the FBI agents that 1) he had never accepted money from the CW; 2) the CW never offered to hold a fundraiser, and 3) the CW never offered him money or other assistance. Testifying at trial three years later, Mr. Turner reiterated that he had no memory of the meeting with Wilburn when he spoke with agents. Evidence adduced at trial established that Turner met and spoke with Wilburn for a total of 27 minutes in the summer of 2007. Turner's explicit statements to FBI on October 28, 2008, that he did not remember Wilburn in August, 2007 (over fourteen (14) months after speaking with him) is certainly one of two possible and truthful responses(that he remembered him or that he didn't). Mr. Turner denies that he intentionally provided false information to the agents.

## ARGUMENT

DEPARTURE FROM THE GUIDELINES

The Defendant should be sentenced to a term of probation, rather than incarceration, and there are several factors that support a departure from the sentencing guidelines in this case.

---

[2] In light of the Government's position not to prosecute the conspiracy, Ms. Wilkerson should not be considered a co-defendant.

United States v. Booker, 543 U.S. 220, 262 (2005) directed the Court to the considerations set forth in 18 U.S.C. §3553 in determining whether to impose a guideline sentence. Defendant submits that application of those factors indicates a sentence below the guidelines in this case. The Defendant maintains his innocence in this case. However, even if the Court were to presume that all the facts the Government alleges were true, departure from the guidelines is justified in this case.

As was even recognized prior to *Booker*, the court should keep in mind that a particular guideline is intended to cover the "heartland" of offense conduct and a particular statutory offence can cover a wide range of culpability. See Koon v. United States, 518 U.S. 81, 105 (1996). Extortion under color of official right – in which the essence of the crime is that the defendant receives money knowing what motivates the other person, *See* United States v. Cruz-Arroyo, 461 F.3d 69, 73 (1st Cir. 2006) – can range from the acceptance of gratuities, *Id.* at 74 ("intended as reciprocity for official acts, past or future"[.]) to aggressively putting one's office up for sale.  The court should depart downward, USSG § 5K2.0, on the basis that the Defendant's actions were outside the heartland of offenses typically occurring under the principal statute of conviction. U.S. v. Shinderman, 515 F.3d 5, 18 -20 (1st Cir. 2008).

Here, even if one were to presume that all the facts as framed by the Government were true, Mr. Turner is alleged to have received one thousand ($1,000) dollars on one (1) occasion. It is not alleged that Mr. Turner ever solicited or otherwise requested money from anyone.  It is not alleged that Mr. Turner had ever been known to have taken money illegally before this case. There is no support that his office was "up for sale".  The facts in this case do not justify

incarceration. The extent and degree of Turner's culpability as established by the trial record supports a sentence of probation as reasonable.[3]

An additional factor that justifies a departure from the guidelines is Mr. Turner's extensive history and commitment to public service. Sentencing Guideline 5H1.11 states that "[m]ilitary, civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." The guideline generally discourages departures on the stated grounds; but it does not bar them absolutely. U.S. v. Canova, 412 F.3d 331, 356 - 359 (Conn.2005). Even under a mandatory Guidelines system, a court was authorized to grant a downward departure "if the [discouraged] factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." Koon v. United States, 518 U.S. 81, 96, 116 S.Ct. 2035 (1996); accord United States v. Sprei, 145 F.3d 528, 534 (2nd Cir.1998).

Much of Turner's life has been dedicated to helping people and ensuring equality for all. His service to the communities of Boston can be measured in the many examples of committed advocacy and concrete assistance to poor and working people.  As is demonstrated by the letters written to the Court on Mr. Turner's behalf, Mr. Turner has helped and supported many people and causes, asking for nothing in return.  In fact, it was not until he was fifty-nine (59) years old that he even ran for office.  Prior to his election as a Boston City Councilor, Mr. Turner built his reputation for integrity and substance through extensive organizing, volunteer work and pursuit

---

[3] It was also established at trial and through discovery that there were several unindicted people involved in this case whose level of involvement in illegal activity clearly exceeded that of what the Defendant is accused of doing. This case has all the appearances of a selective prosecution, in light of the fact that only two (2) public officials were charged in this case, both of African American descent.  The circumstances of the case have the appearance of an agenda, and leaves open the debate on the existence of what is known as the F.B.I.'s "Fruhmenschen" project.  The Fruhmenschen objective, as research suggests, is to target and eliminate black elected officials.

of social justice. Following his election, Mr. Turner's  continued to advocate for those struggling and underrepresented in Boston. These principles are manifest in his commitment to maintain an office located within his district despite running at a deficit and accruing personal debt.

Mr. Turner has suffered catastrophic loss as a result of this case and his conviction. Prior to this case, Mr. Turner had loaned his political committee approximately one hundred and seventy five ($175, 000) thousand dollars over the last eleven years to maintain the operation of the District 7 office in Roxbury and the District 7 Roundtable monthly meetings.  Mr. Turner had to convince his wife that one day the political committee would have enough money to pay them back.

The consequences of Mr. Turner's conviction make it unlikely that the debt from operating a second community-based office and campaigning will ever be repaid.  In addition to losing a substantial salary, Turner will be denied a pension with little or no time to establish an alternative retirement income.  As a dedicated representative and advocate, Mr. Turner enjoyed his council job and worked long hours every day.  His conviction and removal constitutes a significant punishment and life-altering experience.

Based on the foregoing, Mr. Turner, requests that this Court depart down from the sentencing guidelines, and sentence him to a term of probation.


OBSTRUCTION OF JUSTICE DISCUSSION

The Government has indicated that it will be seeking a two (2) level enhancement for obstruction of justice due to the fact that Mr. Turner testified at trial.  It is the Government's position that Mr. Turner committed perjury by testifying.   Mr. Turner venomously denies committing perjury.

Not every accused who testifies at trial and is convicted will incur an enhanced sentence under § 3C1.1 for committing perjury. U.S. v. Dunnigan, 507 U.S. 87, 95-98 (1993). As the court has observed, an accused may give inaccurate testimony due to confusion, mistake, or faulty memory. A defendant's testimony may be truthful, but the jury may nonetheless find the testimony insufficient to excuse criminal liability or prove lack of intent. For these reasons, if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition. See U.S.S.G. § 6A1.3 (Nov.1989); Fed.Rule Crim.Proc. 32(c)(3)(D). See also Burns v. United States, 501 U.S. 129, 134, 111 S.Ct. 2182, 2185 (1991). When doing so, it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding. The district court's determination that enhancement is required is sufficient, however, if, the court makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury. See App. 29 Where a court finds that a defendant fails to give truthful testimony on material matters *that were designed to substantially affect the outcome of the case,* the court may conclude that the false testimony at trial warrants an upward adjustment by two levels. U.S. v. Dunnigan, 507 U.S. at 95.

The Supreme Court recognized in United States v. Dunnigan, the criminal law establishes three elements for perjury: (1) "false testimony" given "under oath or affirmation"; (2) "concerning a material matter"; (3) given "with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993) (citing 18 U.S.C. § 1621); (2004). Acknowledging that some of its own precedents had not interpreted perjury to constitute obstruction of justice "unless the perjury is

part of some greater design to interfere with judicial proceedings," United States v. Dunnigan, 507 U.S. at 93, 113 S.Ct. 1111, the Supreme Court ruled that, when a defendant objects to a § 3C1.1 enhancement based on trial testimony, "a district court must review the evidence and make independent findings necessary to establish *a willful impediment to or obstruction of justice,* or an attempt to do the same, under the perjury definition we have set out," *id.* at 95, 113 S.Ct. 1111 (emphasis added). *See also*, U.S. v. Canova, 412 F.3d 331, 356 -359 (2nd Cir. Conn. 2005), "§ 3C1.1 enhancement required it "to find that the defendant not only perjured himself, but [that] he did so with the specific intent to obstruct justice".

Such a finding of perjury is not automatic however.  The Government has the burden of establishing, by a preponderance of the evidence, the facts that would support the enhancement. *See* U.S. v. Brennan, 326 F.3d 176, 199 -201 (3rd Cir. 2003); United States v. Helbling, 209 F.3d 226, 250 (3d Cir.2000). As a further safeguard, the Sentencing Commission has advised the judiciary that "the defendant's testimony and statements should be evaluated in a light most favorable to [him]." *See* U.S.S.G. § 3C1.1, comment. (n. 1). This note suggests that, if perjury is less than apparent on the record as a whole, with due respect for the trial judge's coign of vantage and allowing reasonable latitude for credibility assessments, the defendant should be given the benefit of the resultant doubt. U.S. v. Akitoye, 923 F.2d 221, 228 -229 (1st Cir.1991). *See, e.g.,* United States v. Barbosa, 906 F.2d 1366, 1370 (9th Cir.), *cert. denied,* 498 U.S. 961, 111 S.Ct. 394, 112 L.Ed.2d 403 (1990) (sentencing judge should resolve in defendant's favor those conflicts about which the judge, after weighing the evidence, has no firm conviction); United States v. Wallace, 904 F.2d 603, 604-05 (11th Cir.1990) (same); United States v. Franco-Torres, 869 F.2d 797, 800 (5th Cir.1989) (same). When all is said and done, an upward adjustment for obstruction of justice under U.S.S.G. § 3C1.1 requires more than a mere conflict in the trial

testimony or a jury's rejection of a defendant's alibi or denial of guilt. U.S. v. Akitoye, 923 F.2d at 228-229.

In this case, the Defendant's testimony does not constitute perjury on its face. The Defendant testified that he did not remember meeting with Wilburn. However, he did not deny that the meeting ever took place or that what was passed to him and depicted in a video-recording was money. Rather, he testified that had he been provided one thousand ($1,000) dollars on the day in question, that he would have remembered. Indeed, Mr. Turner acknowledged in his testimony cited by the Government that, assuming the video was accurate, it did display him meeting with Wilburn at his district office in Roxbury, and that it did appear something was passed to him. However, Mr. Turner testified that he had no specific memory ("remembrance") of this meeting.

Nor can one say that Mr. Turner's testimony at trial was irreconcilably inconsistent with the jury's verdict. *Contrast* U.S. v. Villarman-Oviedo, 325 F.3d 1; 16 (1st Cir. 2003); U.S. v. Johnson, 302 F.3d 139, 154 (3rd Cir. Pa.2002), court did not err in enhancing the defendant's sentence based on obstruction of justice, where defendant's testimony at trial were irreconcilably inconsistent with the verdict. *But see also*, U.S. v. Shinderman, 515 F.3d 5, 19, n. 9 (C.A.1 (1st Cir. Me.2008), where Court indicated it "would be improper to impose an obstruction of justice enhancement 'merely ... because the jury rejects the defendant's explanation of the facts and finds him guilty,' United States v. Gobbi, 471 F.3d 302, 314 (1st Cir.2006)"; U.S. v. Sanders, 341 F.3d 809, 819 -820 (8th Cir. Iowa 2003), where court found no obstruction of justice, despite the fact that the Defendant was found guilty and court had credited the police's testimony over that of the Defendant's. The verdict, nonetheless, can provide support for the sentencing court's independent findings, *see* United States v. Villarmán-Oviedo, 325 F.3d 1, 16 (1st Cir.2003)

(upholding a finding of perjury in part because the jury "must perforce have determined that [the defendant's] testimony was false").

Mr. Turner did not deny meeting with Wilburn, or taking some amount of money.  Mr. Turner stated that he had no memory of the meeting.  His explanation, in and of itself, does not amount to perjury, and is not inconsistent with a guilty verdict.  Rather, the jury found that his explanation was insufficient to overcome the evidence presented by the Government.[4]

## CONCLUSION

For the foregoing reasons, the Defendant, Chuck Turner, requests that this Court not enhance his sentence based on obstruction of justice, depart downward from the guidelines, and sentence him to a term of probation.

Respectfully submitted,
FOR THE DEFENDANT,


   /s/ Barry P. Wilson
Barry P. Wilson, Esq.
LAW OFFICES OF BARRY P. WILSON
240 Commercial Street, Suite 5A
Boston, MA  02109
(617) 248-8979
(617) 523- 8700 (fax)
BBO# 529680

---

[4] Given the fact that Mr. Turner testified, the jury very likely may have shifted the burden, requiring that Mr. Turner prove his innocence, rather than requiring the Government to prove guilt.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 21, 2011 I electronically filed Defendant's Sentencing Memorandum with the Clerk of Court using the CMF/ECF system which will send notification of such filing to the following: United States Attorney's Office, Boston, Massachusetts.

/s/ Barry P. Wilson